**Velbert REED, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09 84 045 CR.**

Court of Appeals of Texas,
Beaumont.

Nov. 21, 1984.

Paul Buchanan, Beaumont, for appellant.

John R. DeWitt, Asst. Criminal Dist. Atty., Beaumont, for appellee.

## OPINION

DIES, Chief Justice.

Appellant was convicted by a jury of theft, and the jury assessed punishment at five years in the Texas Department of Corrections. Appeal has been perfected to this Court.

Appellant argues under his sole ground of error that the evidence is insufficient to support a conviction for theft of "money".

Dennis Lane, employed with Martin-Matthews Oil Company in Beaumont, was directed by his supervisor on July 18, 1983, to make a service call on the pumps at Station No. 144. After calling appellant, who informed Lane the pumps were out of gas, Lane had the pumps turned on and found they were not working. He then "stuck" the tanks with a stick gauge and found they were almost empty. Prior to appellant's taking over the station, Lane had installed four gasoline pumps with new computers. Lane had checked the calibration of these computers and found them accurate. This check was performed before appellant took over the station.

Again on July 23, 1983, Lane's superior dispatched him to make another service call on the same station. He checked the pumps at around 9 a.m. and found "that all the seals on the totalizers were missing and most of the totalizers had broken glasses and weren't legible, readable", and that they appeared to have been tampered with. He reported this to the main office.

The State next called Madeline Adcock, station supervisor for Martin-Matthews. On the "lease" stations it was her job to daily collect the money for the gasoline and the daily reports. She found appellant out of gas on July 18, 1983, called the company and had more delivered. On July 22nd, the same thing happened, and she found it "unusual" that the cash meter readings were "still the same and the gallons had changed, so that told me that the cash meter readings on the meters weren't working, they were broken." Appellant was supposed to have the cash readings on his daily reports but when she checked back they were not there. The gallons and cash readings are hooked up on the same meters, so when the gallons meter changed showing the sale of gas, the cash meter should also change; but the cash meter showed no change. This indicated to the witness that something was wrong with the meters. These daily reports were made by appellant and most of the time she saw him making the daily report or, rather, filling it out.

Audie Murphy makes the actual deliveries of the gas to the stations. Murphy

identified Exhibits Nos. 7, 8, 9 and 10, one of which was signed by appellant, which showed the amount of deliveries in June and July of 1983. The witness answered, "That is correct" to counsel's statement:

"The way [the company] determined that the internal controls or how much gas should have been in a tank was they took the amount of gas that was on hand at the last month, which you made a stick reading of, the last stick reading you made, added the number of drops [deliveries], the gallons that had been dropped during that month ... [a]nd subtracted the gallons sold and reconciled it by your taking another stick reading to make sure those two figures coincide."

James Conway, Vice President and General Manager of the Martin-Matthews Oil Company, and a Certified Public Accountant, testified appellant operated the station in question on a consignment basis from March 2, 1983, through July 23, 1983. This meant the company owned the station, paid the property taxes on it, put the gasoline in the ground, and paid appellant a commission for each gallon that was sold. The witness also testified that the money appellant received for the sale of the gas, other than the commission, belonged to the company. Appellant was to deduct his commission from the net amount of what he remitted to the company on a daily basis; that, as financial officer of the company, he had never given appellant permission to withhold any moneys except his commission.

On July 19, appellant called reporting he was out of unleaded gas. The company's "perpetual inventory" showed that "he should have had gasoline in the ground at that time." Based on this inventory the company was short $8,782.08. The witness then identified the records of the station and, using Exhibit No. 13 or "reconciliation" that he prepared, explained how the company was shorted by appellant's reports and what this meant in monetary terms. That this shortage in money was withheld from the company by appellant and without the company's consent. The witness had prepared other exhibits, Nos.

14, 15, and 16, showing the shortage on other pumps and their translation in monetary terms.

In an able brief, appellant urges that these facts summarized above are on "all fours" with *Sanchez v. State*, 645 S.W.2d 491 (Tex.App.—Corpus Christi 1982, no writ). In *Sanchez*, appellant entered into an agreement with an oil company wherein the latter agreed to install two gasoline tanks and two pumps at appellant's grocery store, and to supply the appellant with gasoline at wholesale prices. "The appellant agreed to sell the gasoline at a retail price and to remit to the [company] the wholesale price for the gasoline sold." As in the case at bar, the number of gallons sold by appellant, and thus the amount of money due the company, was determined from a small computer in each pump which recorded the number of gallons passing through the pumps. "The appellant was not obligated to pay for the gasoline until it passed through the pumps.... [A]t the close of each business day, the appellant recorded the numbers displayed by the computers to determine the number of gallons sold that day and the amount of money that was due [the company]." Sometime after the agreement the company discovered a discrepancy of approximately 6,000 gallons between the company's readings and the appellant's readings. The indictment stated the appellant did "knowingly appropriate property, to-wit: UNITED STATES CURRENCY of the value of $200.00 or more, but less than $10,000.00 from the owner ...." After conviction by a jury, the Corpus Christi court held:

"It is well established in Texas that a conviction for theft cannot rest in whole or in part upon the theft of property not alleged in the indictment." (citations omitted)

and ordered the appellant acquitted.

The indictment in the case at bar alleged appellant "did then and there intentionally and knowingly appropriate property, by acquiring and exercising control of corporeal personal property, namely: current money of the United States of America ... of the

value of at least Seven Hundred fifty and No/100 ($750.00) dollars, but less than Twenty Thousand and No/100 ($20,000.00) dollars ...."

The State strives valiantly to show us distinctions between *Sanchez, supra,* and the case at bar; but to us, it is a distinction without a difference. And, were we to follow *Sanchez, supra,* it would be our duty to acquit the appellant. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). However, with due respect to our brethren from Corpus Christi, we believe appellant was appropriating money. It was his duty daily to turn over all the proceeds from the sale of the gas in *"money"* to the company less his three percent commission. This point of error is overruled.

The judgment of the trial court is affirmed.

Affirmed.